

**FILED**

**3:29 pm, 7/29/22**

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

MARK AND TRESSA NELSON,   Wrongful )
Death Representatives for the Estate of )
EMMA DELENE NELSON, and KYLE AND )
CHRISTINA BOWERS, Wrongful Death )
Representatives for the Estate     of )
KOREY BOWERS, )
)
Plaintiffs, )
)
    vs. )
)
MCLANE COMPANY, INC., a corporation, )
TRANSCO, INC., a Nevada corporation, )
CONAN FERGUSON and MANOS )
ZOURIDAKIS, )
)
Defendants. )

Case No. _____22-CV-166- KHR_____

**COMPLAINT, JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL**

Mark and Tressa Nelson, Wrongful Death Representatives for the Estate of

Emma DeLene Nelson, and Kyle and Christina Bowers, Wrongful Death Representatives

for the Estate of Korey Bowers, Plaintiffs in the above-captioned matter, by and through

their counsel of record, for their cause of action against the Defendants, state, allege,

and aver as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

Mark and Tressa Nelson are the duly-appointed Wrongful Death Representatives

for the Estate of Emma DeLene Nelson.  Mark and Tressa are citizens and residents of

Juniata, Adams County, Nebraska.  Their daughter, Emma DeLene Nelson, was 19 years

old when she left this world in the crash that is at issue in this case.

2.

Kyle    and    Christina    Bowers    are    the    duly-appointed    Wrongful    Death

Representatives for the Estate of Korey Bowers.  Kyle and Christina are citizens and residents of LaGrange, Goshen County, Wyoming.  Their son, Korey Bowers, left this world on the night of his 18th birthday.

3.

Conan Ferguson is a citizen and resident of Briggsdale, Colorado.  At the time that he crashed into EMMA and KOREY's car, he was driving a tractor-trailer in the course and scope of his agency and employment with TRANSCO and its parent corporation, MCLANE.

4.

Manos Zouridakos is a citizen and resident of Longmont, Colorado.  At the time of this crash, he was a co-driver, riding in the course and scope of his agency and employment with TRANSCO and its parent corporation, MCLANE.

5.

TRANSCO is a Nevada corporation engaged in the nationwide business of interstate trucking; its principal place of business is in Danville, Illinois; it is a motor carrier licensed and regulated by the Federal Motor Carrier Safety Administration to operate commercial motor vehicles for profit throughout the United States, including the State of Wyoming, with the USDOT # 1062707.  TRANSCO is a wholly-owned subsidiary of MCLANE, which is a Texas corporation also engaged in the nationwide business of interstate trucking, registered to do business in the State of Wyoming. MCLANE's principal place of business is 4747 McLane Parkway, Temple, TX 76504.

6.

There is complete diversity between Plaintiffs and Defendants, and the matter in controversy greatly exceeds, exclusive of interest and costs, the sums specified by 28

U.S.C. § 1332.  The events at issue took place outside of LaGrange, Goshen County, Wyoming.  Venue and jurisdiction are proper in this Court.

## MCLANE AND TRANSCO

7.

By virtue of registering with the U.S. Dept. of Transportation (by obtaining a "USDOT" number and/or operating authority for its business purposes), Defendant TRANSCO certified that it would comply with and be subject to the Federal Motor Carrier Safety Regulations.

8.

By virtue of registering with the U.S. Dept. of Transportation (by obtaining a "USDOT" number and/or operating authority for its business purposes), Defendant MCLANE certified that it would comply with and be subject to the Federal Motor Carrier Safety Regulations.

9.

Defendant TRANSCO employed 3,657 drivers and operated 1,832 power units in 2021, which drove mileage of 108,609,224 miles all across the United States.

10.

As licensed motor carriers, TRANSCO and MCLANE have regulatory and common-law duties to properly investigate and qualify drivers before putting them on the road to drive 18-wheelers.

11.

As licensed motor carriers, TRANSCO and MCLANE have regulatory and common-law duties to properly train their drivers before putting them on the road to

drive 18-wheelers.

12.

As licensed motor carriers, TRANSCO and MCLANE have regulatory and common-law duties to ensure compliance with the training by the drivers of their 18-wheelers.

13.

Before November 17, 2021, TRANSCO hired FERGUSON and gave FERGUSON the responsibility of driving a truck TRANSCO owned in the regular course and scope of his agency and employment with TRANSCO.  On the night of November 17, 2021, this truck was a 2016 Volvo tractor, VIN 4V4NC9EH3GN965307 with a trailer attached.

14.

As a commercial motor vehicle operator, FERGUSON certified he would comply with and be subject to the Federal Motor Carrier Safety Regulations.

15.

On the night of November 17, 2021, FERGUSON was driving with a trainee, ZOURIDAKOS, also an employee and agent of TRANSCO.  Both FERGUSON and ZOURIDAKOS were was acting in the course and scope of their agency and employment with TRANSCO at the time of this catastrophic crash.

## KOREY AND EMMA

16.

KOREY and EMMA were sweethearts.  The following photograph depicts KOREY and EMMA together:



17.

They met in their first year of study at Frontier School of the Bible in LaGrange, Wyoming. Both KOREY and EMMA were deeply committed to their Christian faith, with plans for lifelong service in ministry. They also planned to introduce their families to each other in the coming months, as a preface to engagement and marriage, completing their Frontier education in housing for married students at the LaGrange campus.

18.

KOREY was strongly family-oriented. He came to LaGrange to follow his brother, Caleb, who was also a Frontier School of the Bible student. KOREY had boundless creative energy. He was a gifted guitarist, vocalist and composer. He shared

his dad's love for woodworking and was self-taught in whittling, carving and forging blades, knives and swords by hand, on his coal forge.  KOREY was a talented sketch artist and enjoyed calligraphy.  He was also a passionate outdoorsman, whose passion grew from the time he spent with his dad in camping, exploring, hunting and fishing. Bible camp ministry was something that KOREY loved from a young age. His life plan was to obtain a skilled trade in construction, serve as a worship leader, and work with kids at camp.  Had KOREY lived, his creativity would have driven his ministry.

19.

Like KOREY, EMMA was also strongly family-oriented.  She loved her brothers and sister and her parents.  EMMA played the ukulele, bass and piano, and cared for all animals. She had found great joy in traveling and exploring new places with Bible camp missions before graduating from high school through her home-school program. EMMA was a voracious reader of both fiction and timely non-fiction.  She was also an intuitive visual artist, whose natural "doodles" and sketches communicated the stories of what was on her heart on any given day.  EMMA chose Frontier School of the Bible because its small-town, supportive environment suited her quiet nature more than the larger Christian universities.

20.

KOREY and EMMA respected and followed the honor code of Frontier School of the Bible, which required that couples in dating relationships limit their physical interactions but allowed alone time off-campus if they returned before curfew.  Time-stamped video footage from Frontier School of the Bible shows that on the evening of KOREY's 18th birthday, after listening to music in the common area of the Student Center, KOREY and EMMA left Frontier School of the Bible at 9:45 p.m. in EMMA's car

for an evening drive together, with KOREY driving EMMA's Ford Taurus and EMMA riding in the passenger seat.

21.

KOREY and EMMA had not been drinking alcohol or consuming any other intoxicants.

22.

Not only was it KOREY and EMMA's own expectation that they would return shortly, but it was also the expectation of their classmates: KOREY's dormmates in the Frontier men's dorm were expecting his return so they could pull a birthday prank by "dogpiling" on KOREY when he reentered the dormitory at curfew.


**THE CRASH**

23.

About 16 minutes later, KOREY was driving EMMA's Ford Taurus northbound on U.S. Highway 85, with EMMA riding in the passenger seat.  As he approached the intersection of U.S. Highway 85 (Hwy 85) and Wyoming 313, KOREY braked and activated the left turn signal, as if to turn left onto Wyoming 313.

24.

The taillights on EMMA's Ford Taurus were fully operational and illuminated.

25.

KOREY and EMMA had a right to safely turn off of Hwy 85.

26.

At the same time and place, and just behind KOREY and EMMA, FERGUSON was driving TRANSCO's 18-wheeler northbound on Hwy 85.  He was acting in the

course and scope of his agency and employment with TRANSCO and MCLANE.

27.

As between KOREY and FERGUSON, KOREY had the right of way in the northbound lane of Hwy 85.

28.

FERGUSON had a duty to avoid taking KOREY's right of way.

29.

FERGUSON had a duty to allow KOREY to turn safely off of Hwy 85 before trying to pass him.

30.

ZOURIDAKOS was in the sleeper berth of the tractor, asleep.  He was doing nothing to help FERGUSON watch the road ahead.

31.

FERGUSON was traveling at 65 miles per hour, using his cruise control.

32.

TRANSCO's in-cab video, as seen in the following still-shot from the video, shows that as FERGUSON approached the intersection of Hwy 85 and Wyoming 313, the taillights of EMMA's Ford Taurus were visible ahead of FERGUSON:



33.

TRANSCO's in-cab video, as seen in the following still-shot from the video, also shows that, rather than staying in his lane and slowing down to safely allow KOREY and EMMA to turn off of the roadway, FERGUSON instead chose to drive into the emergency lane to use it as a *de facto* passing lane, to try to pass KOREY and EMMA on their right:



34.

FERGUSON could see that there was no oncoming traffic – meaning that FERGUSON knew that he would not have to wait but a few moments for the Ford

Taurus to complete a turn.

35.

As FERGUSON later admitted to investigators, he also observed that the brake lights of the Ford Taurus were illuminated and its left turn signal was activated.

36.

All FERGUSON had to do to avoid this crash was respond in accordance with the law to the brake lights and turn signal of the Ford Taurus ahead of him, _slow down_ for a matter of moments, and wait for the Ford Taurus that he could clearly see to make its move.

37.

But instead, FERGUSON maintained his speed and attempted to pass the Ford Taurus in the right-hand emergency lane.  This is what FERGUSON admitted to investigators.

38.

FERGUSON did not even deactivate his cruise control in his attempt to pass the Ford Taurus in the emergency lane.

39.

At the location where this deadly crash occurred, the right-hand emergency lane of the northbound lane is not a full-sized paved shoulder similar to what appears on an interstate.  There is some pavement, followed by grass with a downward grade.

40.

FERGUSON's actions as described in the paragraphs above were inexcusably negligent.

41.

FERGUSON's actions as described in the paragraphs above were reckless.

42.

As FERGUSON bore down on the Ford Taurus in his 18-wheeler, KOREY panicked and, instead of turning left, tried to move the Taurus to the right, which is where FERGUSON was moving the 18-wheeler in his reckless and illegal attempt to pass on the dangerously unaccommodating right emergency lane.

43.

KOREY and EMMA experienced the terror of seeing the blinding lights of an 18-wheeler hurtling toward their car at highway speed, not slowing or stopping as the rules of the road require.  Their last moments in this world were feelings of shock, terror, and resignation that their time with their families and their lives of ministry together were ending far too soon.

44.

TRANSCO's event download recorder confirms that FERGUSON did not hit the brakes until moments before smashing TRANSCO's 18-wheeler into the Ford Taurus. The 18-wheeler killed EMMA on impact.  KOREY lived, in agony, for a short time, experienced conscious pain and suffering, and then succumbed to his fatal injuries.

45.

The following photograph depicts the damage to EMMA's Ford Taurus after the collision:



46.

A reasonably prudent motor carrier in the position of TRANSCO and/or MCLANE would have a driver safety training program consistent with industry standards.

47.

A reasonably prudent motor carrier in the position of TRANSCO and/or MCLANE would also implement methods and measures, through monitoring, incentives, and/or requirements on drivers, etc., to ensure its drivers comply with all training and industry standards while driving their 18-wheelers.

48.

TRANSCO and MCLANE each have a duty to act as a reasonably prudent motor carrier in its operations.

49.

Upon information and belief, TRANSCO and MCLANE failed to properly train their drivers and/or ensure their compliance with all training and industry standards

while driving their 18-wheelers.

50.

Upon information and belief, TRANSCO and/or MCLANE further failed to exercise reasonable care in the hiring, training, supervision, and/or retention of FERGUSON.

51.

The actions, failures to act, negligence, and recklessness of TRANSCO, MCLANE, FERGUSON, and ZOURIDAKOS, singularly and in combination, and independently and concurrently, all directly and proximately caused the subject crash.

## COUNT I

### NEGLIGENCE AND RECKLESSNESS OF FERGUSON AND ZOURIDAKOS

52.

All preceding paragraphs are incorporated herein by reference.

53.

The crash was proximately caused by the negligence and recklessness of Defendant FERGUSON, acting in the course and scope of his employment, in the following particulars:

a.    By failure to exercise proper lookout;

b.    By failure to yield the right of way;

c.    By failure to keep his vehicle at a speed that would enable him to stop before reaching KOREY and EMMA's vehicle;

d.    By failure to take appropriate steps to avoid the crash when he knew or should have known that such a collision was foreseeable;

e.      By attempting what he knew was a dangerous maneuver;

f.      By passing on the right, in an emergency lane which is not intended

for traffic, instead of simply slowing down and waiting for a matter

of moments for KOREY to finish his turn; and

g.      By attempting to pass on the right at an intersection.

54.

The collision was proximately caused by the negligence of Defendant
ZOURIDAKOS, acting in the course and scope of his employment, by him not staying
awake to help FERGUSON watch the road ahead of him, make prudent decisions, and
remind FERGUSON to follow the rules of the road as set forth above.

55.

TRANSCO and MCLANE are vicariously liable for the recklessness and
negligence of FERGUSON and ZOURIDAKOS.

## COUNT II

### NEGLIGENCE OF TRANSCO AND MCLANE

56.

All preceding paragraphs are incorporated herein by reference.

57.

The collision was also proximately caused by the negligence of Defendant
TRANSCO, in these particulars:

a.      Negligent hiring;

b.      Negligent training and supervision of, and/or ensuring of training

compliance by, FERGUSON before and on November 17, 2021;

c.      Negligent training and supervision of ZOURIDAKOS on and before

November 17, 2021, who failed to stay awake to direct FERGUSON

to watch the road and follow the rules of the road.

58.

Failure to develop and implement a training program that incorporates the
essential tenets of safe driving of 18-wheelers carries with it a known and substantial
risk of severe bodily injury and/or death to members of the public, particularly where
the consequences of that training program literally travel through hundreds of drivers
who drive all across the United States.

59.

TRANSCO and/or MCLANE knew the substantial risk of severe injury or death
associated with its drivers violating basic rules of the road and 18-wheeler safety
standards, including but not limited to the ones described herein.

60.

To the extent that FERGUSON did not clearly know that he was violating basic
safety rules as described herein, or else his employer had sent the message that the rules
could be violated without consequences, then TRANSCO and/or MCLANE are an
independent and contributing cause of the subject crash, and are partially or wholly at
fault in a percentage amount to be determined by the jury.

61.

To the extent that TRANSCO and/or MCLANE failed to do everything necessary
to endure lasting compliance with 18-wheeler safety standards as described herein, then
TRANSCO and/or MCLANE are an independent and contributing cause of the subject
crash, and are partially or wholly at fault in a percentage amount to be determined by
the jury.

62.

All of TRANSCO's negligence is imputable to MCLANE, its parent company, which controls and governs TRANSCO's acts, omissions and failures.

## **DAMAGES**

63.

All preceding paragraphs are incorporated herein by reference.

64.

As a proximate result of the negligence and recklessness of Defendants as set forth herein, singularly and in combination, and independently and concurrently, Plaintiffs suffered the catastrophic losses of KOREY and EMMA.

65.

The loss of KOREY to the beneficiaries of his ESTATE, including his brother Caleb and his mom and dad, includes the comfort, care and companionship that KOREY provided to those family members who were left behind when this crash took KOREY from this world.

66.

The loss of EMMA to the beneficiaries of her ESTATE, meaning her mom and dad and her siblings Jack, Levi and Miranda, similarly includes the comfort, care and companionship that EMMA gave to them until she was taken from this world by these Defendants' inexcusable negligence.

67.

After the crash but before he died, KOREY also experienced extreme and conscious pain and suffering while he fought for his life and his future at the scene of the

crash, while in the ambulance, and at the hospital, not realizing that EMMA had already left this world.

69.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount exceeding $75,000, exclusive of interest and costs, in an amount to be specifically proven at trial;

2. Punitive damages available under the laws of the States of Wyoming, Nevada, and Texas;

3. Exemplary damages because the Defendants acted recklessly and/or willfully and wantonly;

4. For statutory interest from the date this cause of action accrued;

5. For pre-judgment interest at the maximum legal rate(s);

6. For post-judgment interest at the maximum legal rate;

7. For costs of suit incurred herein;

8. For such other and further relief as the Court deems just and proper.

**JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL**

Plaintiffs request that this matter be tried to a jury in Cheyenne, Wyoming.

Dated this 29th day of July, 2022.

MARK AND TRESSA NELSON, Wrongful Death Representatives of the Estate of EMMA DELENE NELSON, Plaintiff,

  /s/ *Maren Lynn Chaloupka*
Maren Lynn Chaloupka (*pro hac vice*)
Chaloupka Law LLC
1906 Broadway

P.O. Box 1724
Scottsbluff, NE 69363-1724
(308) 270-5091
mlc@chaloupkalaw.net

AND

  /s/ Wendy Palen
Wendy Curtis Palen,
Palen Law Offices LLP
P.O. Box 156
Glendo, WY 82213
(307) 735-4022
palenlaw@gmail.com


KYLE AND CHRISTINA BOWERS,
Wrongful Death Representatives of the
Estate of KOREY BOWERS, Plaintiff,

  /s/ Tom Metier
Michael Chaloupka WSB # 8-6812
Rebecca J. Fisher WSB # 8-6780
T. Thomas Metier WSB #5-2631
Metier Law Firm LLC
4828 South College Avenue
Fort Collins, CO 80525
mike@metierlaw.com
becca@metierlaw.com
tom@metierlaw.com
*Attorneys for Plaintiff*